IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:21-cv-01310-O |
| THE HEARTLAND GROUP VENTURES, LLC, *et al.*, | § § § | |
| Defendants. | § § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court are the Motion to Terminate or Modify Asset Freeze and Receivership

Orders ("Motion") (ECF No. 129), the Memorandum in Support (ECF No. 130), Receiver's Brief

in Response (ECF No. 147), and Plaintiff's Response (ECF No. 149). United States District Judge

Reed O'Connor referred the Motion to the undersigned on February 18, 2022. ECF No. 140. The

Court conducted an evidentiary hearing on the Motion and related responses on March 11, 2022.

ECF No. 156. Having considered the Motion, briefing, evidence admitted at the hearing,

arguments of counsel, and applicable legal authorities, the undersigned **RECOMMENDS** that

Judge O'Connor **DENY** the Motion.

I.      **BACKGROUND**

Movants are Manjit "Roger" Sahota; his wife, Harprit Sahota; and their sons, Sunny and

Monrose Sahota (collectively, "the Sahotas"). ECF No. 129 at 1; *see also* Corrected Declaration

of Sunny Sahota, ECF No. 142, ¶¶ 10-11 [hereinafter "Sunny Decl."]. The Sahotas work in the oil

and gas business (Sunny Decl. ¶¶ 10-11), and they are implicated in this civil enforcement action

brought by Plaintiff United States Securities and Exchange Commission ("SEC"). *See* Complaint, ECF No. 1 [hereinafter "Compl."].

The SEC claims 700 oil-and-gas investors were defrauded of $122 million. *Id.* ¶ 1. It asserts claims under the federal Securities Act and Exchange Act, seeking disgorgement, permanent injunctive relief, and civil penalties. *Id.* ¶¶ 140-167 & pp. 60-63; *see also SEC v. Reynolds*, No. 3:08-cv-0438-B, 2008 WL 4107528, at *2 (N.D. Tex. Aug. 22, 2008) ("The use of disgorgement as an equitable remedy is well-established in securities fraud disputes."). Roger Sahota is a Defendant, while the remaining three Sahotas are Relief Defendants. *See Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009) (citing *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir.1998)) (defining a relief defendant).

The SEC targets several other Defendants, including individuals and entities it collectively references as "Heartland" or the "Heartland Defendants." Compl. ¶ 1 & n.1. The Heartland Defendants allegedly solicited investor funds, of which Heartland directed $54 million to Roger Sahota and two entities with which he works (collectively, the "Sahota Defendants"). *Id.* ¶ 4 & n.4. The Sahota Defendants were to use the Heartland money "for projects involving working over existing oil and gas wells or drilling new wells" ("Sahota-Heartland Projects"). *Id.* ¶ 4.

The SEC contends the Sahota Defendants procured the $54 million after making "material misrepresentations to Heartland, its investors, and persons who solicited prospective investors about the existing and potential production of wells." *Id.* ¶ 6. The Sahota-Heartland Projects allegedly have generated "less than $300,000" in revenue (*id.* ¶ 115), with the Sahota Defendants using "millions of dollars in Heartland investor fund proceeds to purchase a private jet, a helicopter, real estate in the Bahamas, and on other non-oil and gas expenditures for themselves." *Id.* ¶ 5.

Upon the SEC's motion (ECF No. 3), the Court entered an Order for Temporary Restraining Order and Other Emergency Relief (ECF No. 12), Asset Freeze Order (ECF No. 14), and Order Appointing Receiver (ECF No. 17). The Sahotas filed the instant Motion, explaining the Asset Freeze and Receivership Orders improperly froze their assets and deprived them of control over the Sahota entities. ECF No. 130. They want these Orders terminated or modified. *Id.*

## II.    LEGAL STANDARD

In a case such as this one, a court grants ancillary relief like an asset-freeze or receivership order "to maintain the status quo and to preserve assets for satisfaction of a future judgment." *SEC v. Harris*, No. 3:09-cv-1809-B, 2010 WL 11617972, at *3 (N.D. Tex. June 24, 2010), *rec. adopted*, 2010 WL 11617973 (N.D. Tex. Aug. 19, 2010). Accordingly, when reviewing a request to modify or terminate such orders, the Court must consider whether doing so "is in the best interests of the defrauded investors," as the Court "has a duty to ensure that Defendants' assets are available to make restitution to the alleged victims." *See SEC v. Dobbins*, No. 3:04-cv-0605-H, 2004 WL 957715, at *2 (N.D. Tex. Apr. 14, 2004). "The touchstone of the Court's inquiry is 'equity' and a party seeking to unfreeze assets 'must establish that the funds he seeks to release are untainted and that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial.'" *SEC v. Ahmed*, 123 F. Supp. 3d 301, 313 (D. Conn. 2015) (quoting *SEC v. Stein*, No. 07-cv-3125-GEL, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009)), *aff'd sub nom. SEC v. I-Cubed Domains, LLC*, 664 F. App'x 53 (2d Cir. 2016); *accord SEC v. Lee*, No. 14-cv-347-LAB-BGS, 2019 WL 4934181, at *6 (S.D. Cal. Oct. 7, 2019).

## III.    ANALYSIS

The Sahotas' Motion makes alternative requests: (A) release all Sahota and Sahota-entity assets; (B) release certain assets; or (C) permit the Sahotas to remain in their homes and grant them

funds for reasonable living and legal expenses while the case is pending. ECF No. 130 at 13-16. At the outset, the Court must consider an issue concerning standing. The Sahotas move the Court in their individual capacities for relief relating to assets the Sahota entities own, yet those entities are not movants. *See id.* at 2-3; *see generally Roan Bros. Tile Co. v. City of Garland*, No. 3:04-cv-1090-B, 2006 WL 8437017, at *4 (N.D. Tex. Jan. 12, 2006) (citing Texas law) (stating "the general rule that a stakeholder in a legal entity does not have a right to recover personally for harms done to the legal entity"). For purposes of these findings, conclusions, and recommendation, the undersigned assumes the Sahotas are pursuing relief for themselves and on behalf of the entities of whom they are members, shareholders, or interest owners. In any event, the Court's Asset Freeze and Receivership Orders should remain as they are.

### A.    The Court should not release all Sahota and Sahota-entity assets because they have disgorgement liability.

The Court properly freezes assets to protect any potential disgorgement it may order following trial. *See SEC v. Reynolds*, No. 3:08-cv-0438-B, 2008 WL 4561560, at *2 (N.D. Tex. Oct. 9, 2008) (stating the "Court has discretion to freeze assets to preserve funds"). The potential disgorgement equals "the amount with interest by which the defendant profited from his wrongdoing." *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978). "The SEC's burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: 'a reasonable approximation of a defendant's ill-gotten gains [is required] . . . Exactitude is not a requirement.'" *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (quoting *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004)). If the SEC carries this initial burden, then "the burden shifts to the defendant to 'demonstrate that the disgorgement figure [is] not a reasonable approximation.'" *SEC v. AmeriFirst Funding, Inc.*, No. 3:07-cv-1188-D, 2008 WL 1959843, at *2

(N.D. Tex. May 5, 2008) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)).

The SEC asserts the Sahotas have potential disgorgement liability of $54 million. It is undisputed the Sahota Defendants received at least $54 million from Heartland. Hr'g Test.; Sunny Decl. ¶ 13 (referencing "the $54 million Heartland sent to [a Sahota entity]"); ECF No. 130 at 9 (stating "Heartland paid the Sahota entities approximately $54 million."). Allegedly, the Sahota Defendants fraudulently procured these funds and mismanaged them upon receipt. Compl. ¶¶ 5-6. During closing argument at the hearing, the Sahotas recognized $54 million could constitute their potential disgorgement liability. The burden should shift to the Sahotas to show $54 million is unreasonable. *See AmeriFirst Funding, Inc.*, 2008 WL 1959843, at *2.

The Sahotas believe a reasonable approximation of their disgorgement liability is $0, and thus the Court should unfreeze all their and the Sahota entities' assets, because they "made no profits from the alleged transactions with Heartland." ECF No. 130 at 13. They claim they properly used the Heartland funds "to purchase and develop oil and gas interests pursuant to agreements between Heartland and the Sahota-related entities" (Sunny Decl. ¶ 2), so "there can be no disgorgement ordered as a matter of law." ECF No. 130 at 14. The law and the facts do not support the Sahotas' conclusion.

Factually, witness testimony indicated the Sahota Defendants improperly used Heartland funds. On cross examination, Sunny Sahota testified his family could not have purchased the airplane, helicopter, and properties in the Bahamas but for the $54 million they received from Heartland. Hr'g Test. Legally, if the Sahotas improperly expended Heartland investor funds on discretionary items like personal aircraft and real estate, then they remain liable for disgorgement regardless of whether they made profits. *See SEC v. AMX, Int'l, Inc.*, 872 F. Supp. 1541, 1544

(N.D. Tex. 1994) ("A securities violator may not avoid his responsibility to turn over his ill-gotten gains by claiming that he is no longer in possession of the funds due to subsequent unsuccessful investments or other types of discretionary spending.").

Even if the Sahotas properly expended Heartland investor funds, whether they made profits remains irrelevant if they obtained the $54 million through fraud. "Disgorgement deprives wrongdoers of ill-gotten gains; and a person remains unjustly enriched by what was illegally received, whether he retains the proceeds of his wrongdoing [or not]." *SEC v. United Energy Partners, Inc.*, 88 F. App'x 744, 746 (5th Cir. 2004); *see also SEC v. Seghers*, 298 F. App'x 319, 336 (5th Cir. 2008) ("If the Commission shows a causal relationship between the defendant's wrongdoing and the amount by which he was unjustly enriched, that amount of money may be disgorged even if the defendant has otherwise disposed of, reinvested, or spent the particular assets that he wrongfully obtained."). This Court has already found good cause to believe all Defendants, including the Sahota Defendants, committed the misconduct alleged. *See* ECF No. 12 at 3, 6-7 (Temporary Restraining Order). The "no profits" argument is thus unavailing.

The Sahotas alternatively contend $54 million is excessive because it "includes approximately $16 million of funds that Heartland sent to Sahota *before* any of Roger Sahota's alleged fraudulent conduct even occurred." ECF No. 130 at 14. This argument hinges on the first date of Roger's alleged fraud, as pleaded in the SEC's Complaint. *See id.* (citing Compl. ¶ 118). It may be that the SEC has not fully discovered the relevant dates of Roger's fraud at this stage of the litigation. And just because Roger received $16 million before the alleged fraud occurred does not eliminate the possibility that he acted fraudulently concerning those same funds after the alleged fraud began. *See also SEC v. Gilman*, 2021 WL 4125195, at *6 (N.D. Tex. Sept. 9, 2021) (alteration in original) (quoting *First City Fin. Corp.*, 890 F.2d at 1232) ("Any 'risk of uncertainty

[in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'").

Fifty-four million dollars reasonably appears to approximate the Sahotas' potential disgorgement liability. *See also AmeriFirst Funding, Inc.*, 2008 WL 1959843, at \*4 ("In this case, defendants' illegal conduct generated over \$58 million from investors," which "entire sum potentially constitutes [Defendant's] ill-gotten gains from the illegal scheme, even if he diverted all of this money to other people."). The Court properly froze all Sahota and Sahota-entity assets through the Asset Freeze and Receivership Orders, and the Court should maintain those Orders to the extent necessary to preserve at least \$54 million, plus interest. *See Blatt*, 583 F.2d at 1335; *see also Reynolds*, 2008 WL 4561560, at \*2 (explaining the Court may also freeze "funds to pay civil penalties").

### B.     The Court should not release any assets.

Alternatively, the Sahotas ask the Court to release certain mineral lease, real estate, and equipment assets that the Sahotas or Sahota entities purchased before any dealings with Heartland and in which assets Heartland does not have an interest. ECF No. 130 at 15; *see* Sunny Decl. ¶¶ 12. Because the Court "has a duty to ensure that Defendants' assets are available to make restitution to the alleged victims," *see Dobbins*, 2004 WL 957715, at \*2, it should not release any asset to the Sahotas unless they show sufficient funds to satisfy their potential \$54 million disgorgement liability. *See Ahmed*, 123 F. Supp. 3d at 313. The Sahotas contend mineral leases from the Sahota-Heartland Projects exceed \$54 million in value and, because those lease assets are also frozen, the Court should release the distinct assets referenced above. ECF No. 130 at 15; *see also* Sunny Decl. ¶ 15. The evidence for their calculation is unpersuasive.

Albert McDaniel, P.E. testified at length that one Sahota-Heartland Project mineral lease could eventually net approximately \$1.6 billion in income. Hr'g Test. The estimate seems

overgenerous given the uncontroverted allegation that all Sahota-Heartland Projects have generated less than $300,000 in revenue since 2019. Compl. ¶ 115. The Court admitted a copy of an itemized list detailing McDaniel's $1.6 billion calculation. Defs.' Ex. 11, ECF No. 130-1 at 222 ("Sahota-Carson Lease Estimated Value"). The list accounts for one hundred wells drilled and operated on the lease over a fifty-year period, with each well accruing $6 million total for drilling and operation costs. *Id.* While the list reflects McDaniel's fifty-year outlook for the lease's potential value, it is less probative of what a willing buyer would pay to a willing seller for the lease today. Indeed, McDaniel never opined on the lease's current fair market value, he freely admitted basing his estimate on "probable" oil and gas reserves instead of "proven" ones, and he recognized that a bank would not rely on an itemized list like his when loaning money for a development project. Hr'g Test.; *see also* Defs.' Ex. 11, ECF No. 130-1 at 219. McDaniel also maintains a working relationship with the Sahotas, and he indicates Sahota entities on his CV among his current employers, suggesting his opinions are not free from bias. Hr'g Test.; Defs.' Ex. 11, ECF No. 130-1 at 220.

Sunny Sahota testified about a $62.5 million purchase offer the Sahota Defendants received and declined for Sahota-Heartland Project mineral leases. Hr'g Test. But it is unclear whether this now-expired offer fairly reflects those leases' value today, as there is no evidence explaining how the offeror arrived at $62.5 million, whether the Sahotas could have complied with the terms of the proposed purchase had they accepted it, or the ability of the prospective purchaser to consummate the proposed purchase. *See* Defs.' Ex. 6, ECF No. 130-1 at 21-24 ("Offer Letter from Trevino Resources"). Even accepting the offer amount as an indication of the lease's fair market value, the Sahotas could not claim the full value for purposes of showing sufficient funds to satisfy their potential disgorgement liability. The Sahota Defendants share an interest in the Sahota-

Heartland Projects with the Heartland Defendants, and the Complaint alleges "Sahota and Heartland were to split costs and profits 51/49." Compl. ¶ 64. So perhaps the Sahotas could claim 51% of $62.5 million, but this amount would still fall short of the $54 million they must show before the Court could consider releasing any assets.

In balancing the equities, the Court must keep in mind the potentially defrauded investors' best interests. *Dobbins*, 2004 WL 957715, at *2. Missing from the Motion and evidence offered in its support is any independent appraisal documenting the fair market value of the mineral leases within the Sahota-Heartland Projects. Until it receives this probative evidence, the Court should decline to release any assets on the premise that the Sahota-Heartland Projects contain sufficient assets to satisfy any party's potential disgorgement liability. For the sake of the Heartland investors and the Sahotas as well, the Court hopes the Receiver will find a willing buyer who will prove the Sahotas correct in their estimate of their assets' value. But in the meantime, the value of the Sahotas' mineral leases and other assets remains too speculative in the Court's mind to warrant modifying the Asset Freeze or Receivership Orders.

### C.    The Court should deny the Sahotas' final alternative requests.

The Sahotas premise their remaining alternative requests for relief on the argument that "there are sufficient assets in the Receivership Estate to satisfy any potential judgment against the Sahota-related Defendants." ECF No. 130 at 15-16. To the extent the sufficient assets they reference derive from the Sahota-Heartland Projects, the Court should reject their premise for the reasons discussed in the prior section.

The Sahotas ask the Court to "not authorize the Receiver to liquidate the Receivership properties in Eldorado and San Angelo" where the Sahotas live, pending this litigation. *Id.* at 15. The Receiver has not requested authority to liquidate these properties, so the Court should deny this preemptive request without prejudice to renewal if the issue arises.

9

Finally, the Sahotas request limited funds from their frozen assets to support ordinary, necessary living expenses and attorney's fees. *Id.* at 16-17. Unless the Sahotas' interest in accessing those funds outweighs the government's competing interest in preserving them for potential disgorgement, the Court should deny the request. *Dobbins*, 2004 WL 957715, at *3 (quoting *United States v. Thier*, 801 F.2d 1463, 1474 (1986)). The Court may "consider evidence of the moving party's 'overall assets or income' and will deny such requests where parties are 'found to have other sources of income or were requesting funds for luxuries, not necessities.'" *Ahmed*, 123 F. Supp. 3d at 313-14 (quoting *SEC v. Dowdell*, 175 F. Supp. 2d 850, 854 (W.D. Va. 2001)).

The Sahotas request access to frozen assets to support a $250,000 lump-sum payment for attorney fees and roughly $17,500 in monthly living expenses for Roger Sahota and his wife, their sons, and their sons' families. ECF No. 130 at 17. The Motion submits the former $250,000 for "legal defense" without itemizing how the funds would be expended. *See id.* And while there was testimony at the hearing indicating the Sahotas do not have funds to pay attorney fees, the Sahotas did not proffer any evidence showing whether $250,000 is a reasonable amount for them to request for that purpose. *See Dobbins*, 2004 WL 957715, at *2. Without itemization and supportive evidence, the Court should deny this request. *See id.* (denying without prejudice). Unlike with the attorney fees, the Sahotas itemize their monthly living expenses of $17,500 and support them with the declaration of Sunny Sahota, who also testified on this issue. *See* ECF No. 130 at 17; Sunny Decl. ¶ 19; Hr'g Test. Even so, the Court should deny this request too because it is unclear whether the amount sought fairly accounts for the family's assets and income sources. *See Ahmed*, 123 F. Supp. 3d at 313-14.

The Motion's itemized list of monthly expenses does not reflect any income source for the Sahotas (ECF No. 130 at 17), and Sunny testified they currently have no income. Hr'g Test. Yet he conceded the Sahotas derive at least some monthly income from an unfrozen rental property he owns in the State of Washington, perhaps as much as $1,000 per month. *Id.* He also identified similarly unfrozen rental properties he and his brother own in the Bahamas, though he described them as a "break-even" venture. *Id.* It is unclear why the Sahotas did not disclose these revenue sources in their request, as it seems they could, and likely would, impact any living expenses calculation.

More concerning is the Sahotas' explanation for having no source of income—they are not gainfully employed, *nor* are they seeking gainful employment. *Id.* Instead, they are focusing their efforts exclusively on defending against this lawsuit. *Id.* While the Court recognizes the Sahotas' concern about this case, unfreezing assets for their monthly living expenses does not seem equitable without them having made reasonable efforts to obtain gainful employment that would mitigate the amount needed for their expenses. The Sahotas apparently are able to work, as are Sunny's and Monrose's non-party spouses. *See* Sunny Decl. ¶¶ 10-11. They live in two houses, with four of them living together under one roof. *Id.* It seems at least one of the six could seek employment, if not all of them.

The itemized list of monthly expenses also raises questions. Of the $17,500 requested, roughly $7,850 (44%) is for four vehicles, including payments for gasoline, insurance, and promissory notes. ECF No. 130 at 17. If the Sahotas do not intend to seek gainful employment, then it is unclear why they will need four vehicles for their two households. Three vehicles have outstanding promissory notes, costing the Sahotas over $4,100 in monthly note payments. Sunny Decl. ¶ 19. The same vehicles have principal balances of approximately $90,000, 17,000, and

$30,000. *Id.* It seems the Sahotas could sell some of these vehicles, liquidate their equity, and reduce their monthly living expenses.

Their living expenses also include items the Court might properly consider luxuries, such as $685 per month for multiple mobile phones and internet usage. ECF No. 130 at 17. The hearing revealed testimony of additional assets the Sahotas own that could generate income, including one in California. Hr'g Test. At this time, the Sahotas do not show their interest in receiving funds for living expenses or attorney fees outweighs the government's competing interest in preserving those funds for potential disgorgement. *Dobbins*, 2004 WL 957715, at \*3. Equity favors denying their request.

## IV.    CONCLUSION

Because the Sahotas have potential disgorgement liability, and because they do not show sufficient funds to satisfy that liability or otherwise that any funds should be released, the Court should **DENY** the Motion.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). To be specific, an objection must identify the particular finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except

upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

      **SIGNED** on March 18, 2022.

<br/>

                    _____

                    Hal R. Ray, Jr.
                    UNITED STATES MAGISTRATE JUDGE